# EXHIBIT 21



**HARKINS BUILDERS, INC.**     2201 WARWICK WAY, MARRIOTTSVILLE, MD 21104  (410) 750-2600
December 13, 2010                                            www.harkinsbuilders.com

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
3000 Connecticut Avenue, NW
Suite 200
Washington, DC 20008

    Re:    2300 Pennsylvania Ave LLC and Harkins Builders, Inc.
           Project: 2300 Pennsylvania Avenue

Dear Pelin and Mutesh:

    We have received the Owner's letter dated December 3, 2010 (the "December 3 Claim Letter"). Our comments are set forth below. In addition, as referenced in the December 3 Claim letter, Harkins has requested final payment from the Owner. The $510,000 amount requested is not in dispute. The Owner does contend, however, that it is entitled to off-sets for the five items set forth in the December 3 Claim Letter.

    Initially, it should be noted that Section 4.3.1 of the General Conditions specifically provides that "[t]he responsibility to substantiate Claims shall rest with the party making the Claim." The Owner has not provided any substantiation whatsoever for any of its claims. As such they should be rejected out-of-hand on that basis alone. In addition, as explained below, none of those claims are valid. Accordingly, Harkins requests that each of the Owner's claims be denied and that you issue a decision that Harkins is entitled to its final payment in the amount of $510,000.

1.     Liquidated Damages

    In its December 3 Claim Letter, the Owner asserts:

*Section 3.3 of the Contract Agreement between the Parties provides that Substantial Completion of the Work will be achieved within 548 days from the date of commencement of the work, and references Exhibit H for "liquidated damages." Pursuant to the bilaterally executed Change Order No. 9 (attached hereto as Exhibit 1), the Contract Completion Date was extended to April 25, 20[10] and Exhibit H was revised. The revised Exhibit H provides, in part:*

> *The Contractor shall also be liable for and shall pay to the Owner as Liquidated Damages the sum of (a) fifty dollars ($50.00) per day per unit if substantial completion has not been reached as per Article 3.3 by April 25, 2010, and (b) seventy-five dollars ($75.00) per day per unit if substantial completion has not been reached as per Article 3.3 by July 15, 2010.*

*In accordance with Section 4.2.9 of the General Conditions to the Contract, the Architect determines the date of Substantial Completion. Compu.Tecture declared the project Substantially Complete on August 2, 2010. Accordingly, pursuant to the express terms of the Contract, Harkins is liable to the Owner for liquidated damages from April 25 until July 15, 2010 at the rate of $50 per day per unit; and from July 15 until August 2, 2010 at the rate of $75 per day per unit. The Owner herein requests that Compu.Tecture approve its claim for the contractually proscribed liquidated damages.*

The Owner's claim for liquidated damages is without merit.

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 2

Section 9.8.1 of the General Conditions provides: "Substantial completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use."

The Owner was able to occupy and utilize the Work for its intended use as of February 25, 2010. The Owner has not presented any evidence that suggests otherwise, and it cannot do so. Exhibit 1 hereto is a true and correct copy of the Certificate of Occupancy for the Project. It is dated February 25, 2010 and it applies to the entire building, including: all six retail spaces on the first floor, all 118 apartment units on the second through fifth floors, all 74 parking spaces and 52 bicycle spaces in the underground garage.

The Owner did in fact immediately begin occupying and utilizing the Work for its intended use. The Owner has not presented any evidence that suggests otherwise, and it cannot do so. Exhibit 2 hereto is a true and correct copy of a February 26, 2010 email from Eduardo Castro, a Harkins superintendent on the project, to Jason Evans, Harkins's project engineer. It reflects that tenants would begin moving-in the next day, which they did. Also attached (Exhibit 3) is the transmittal for turnover of the keys for those apartments. The Owner accepted the keys for those 16 apartments on February 27, 2010.

Based upon the forgoing, Harkins respectfully requests that you issue a decision that the date of substantial completion for the project was February 25, 2010.

Attached hereto as Exhibit 4 are transmittals for turnover of the keys for all 118 apartment units and all six of the retail spaces. All of the keys had been accepted by the Owner as of March 12, 2010. Accordingly, if you do not find that the Project was substantially complete on February 25, 2010, Harkins respectfully requests in the alternative that you issue a decision that it was substantially complete as of March 12, 2010.

In addition, please reference the last sentence of Exhibit H to the parties' agreement as revised pursuant to Change Order 9 (copy attached as Exhibit 5). It provides: "The Contractor shall be paid an amount of $150,000 if substantial completion has been reached on or before March 25, 2010."

On March 30, 2010, Harkins submitted Pending Change Order 91 to the Owner (copy attached as Exhibit 6). It is for the $150,000 Substantial Completion Incentive Bonus per Change Order #9. On April 23, 2010, the Owner issued Change Order 91 to Harkins (copy attached as Exhibit 7). It too is for the $150,000 early completion bonus.

On June 7, 2010, Harkins submitted Application for Payment 18Rev2 (copy attached as Exhibit 8). As you can see, it includes the $150,000 early completion bonus for Change Order 91. On June 14, 2010, the Owner paid Harkins for Application 18Rev2. Documentation of the wire transfer is included as Exhibit 9 hereto. As you can see, it is for the full amount of Application 18Rev2, which included the $150,000 early completion bonus.

Accordingly, Section 4.2.9 of the General Conditions (cited by the Owner in the December 3 Claim Letter as authority for you to determine substantial completion and liquidated damages) is inapplicable. Harkins and the Owner have already established by binding agreement that the Work was substantially complete no later than March 25, 2010.

Under these circumstances, the only remaining authority for the architect in this regard is to determine whether substantial completion occurred prior to March 25, 2010. As indicated above, Harkins respectfully requests that you issue a decision that the date of substantial completion for the project was February 25, 2010. If you do not grant that request, Harkins respectfully requests in the alternative that you issue a decision that substantial completion occurred on March 12, 2010.

The remediation for the windows did not preclude substantial completion. The Owner occupied and utilized the entire building during that process. The Owner has not presented any evidence that suggests otherwise, and it

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 3

cannot do so. Exhibit 10 hereto is a true and correct copy of a spreadsheet that was used to track the window remediation process. It reflects that 66 of the units were occupied by tenants at the time the remediation was performed. Although it was necessary to coordinate in advance with those tenants, they were not required to vacate during the remediation process and the workers were in each unit for only about an hour and a half to two hours.

Assuming *arguendo* that the need to remediate the windows precluded substantial completion (which it did not), and that the parties to the contact had not already resolved the matter by binding agreement (*i.e.* the Owner approved and paid the early completion bonus), the Owner nevertheless would not be entitled to liquidated damages. The Owner designated the subcontractor and manufacturer for the windows. As such, Harkins is entitled to a time extension for any delays associated with that designation. *See* Exhibit 11.[1]

Assuming *arguendo* that there had been a viable basis for asserting liquidated damages (which there was not) and that the parties to the contract had not already resolved the matter by binding agreement (even though they have in fact done so), the claim is time barred. It was asserted for the first time eight months after the completion date set forth in the contract. *See* General Conditions Section 4.3.2 ("Claims must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim...").

Assuming *arguendo* that there had been a viable basis for asserting liquidated damages (which there was not), that the parties to the contract had not already resolved the matter by binding agreement (even though they have in fact done so), and the claim is not time barred (which it is), the Owner's claim nevertheless would be invalid because Harkins is entitled to time extensions for other matters that would preclude the assessment of liquidated damages. *See* Exhibits 12 and 13.[2]

2.  Garage Waterproofing

In its December 3 Claim Letter, the Owner asserts:

*We refer Compu.Tecture to the Contract and Specification Section 071413, 071616, 071700 and the approved submittals regarding the requirements for the garage waterproofing. As you are aware, Compu.Tecture first identified the numerous garage water leaks in February 2010, and notified the Contractor. The Contractor, without notice or approval from the Owner or Architect, implemented measures to allegedly remedy the defects in performance. Thereafter, the engineering firm SK&A was hired to review the waterproofing, and prepared the attached report (Exhibit 2), confirming the failure of the waterproofing. Notwithstanding, Harkins alleges that the garage leaks and improper waterproofing are a warranty item. The Owner asks Compu.Tecture to approve its claim that:*

*(a) The garage waterproofing does not meet the Contract requirements. Specifically and as documented in SK&A report dated October 11, 2010 the waterproofing was not protected from damage or joints and penetrations were not properly sealed as specified in Section 071700 Bentonite Waterproofing.*

*(b) The Warranty provided does not meet the requirements of Section 071700 in that it includes terms, conditions, and obligations of the Owner not permitted by Section 071700, ¶ 1.9.*

*(c) The recommendations in SK&A's report dated October 11, 2010 (copy attached as Exhibit 2) are appropriate measures to ameliorate the deficient installation.*

---

[1] To the extent it is necessary to do so, please consider Exhibit 11 to be claim for an extension of time.
[2] To the extent it is necessary to do so, please consider Exhibits 12 and 13 to be claims for extensions of time.

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 4

   *(d) The value of the deficient waterproofing provided by Harkins is less than that which would be due under the Contract for a compliant installation for reasons of, among other things, the diminished quality of any "waterproofing", additional periodic maintenance, and the increased risk of future leaks accompanied by further damage from such leaks.*

   *(e) As a result of the failed waterproofing, the Owner requests that a diminished value of $286,277.98 (the waterproofing subcontractor's contract price) be reimbursed to the Owner.*

   *(f) The Owner also requests that Harkins provide a prepaid inspection and maintenance agreement that will identify and repair any leaks over the next 20 years.*

As set forth below, the Owner's claim must be denied.

This issue arose out of a condition that was observed by Harkins in January of 2010. Specifically, moisture was weeping through shrinkage cracks in the concrete at the north and east walls of the underground garage. Signs of moisture penetration appeared only at shrinkage cracks on those two walls and only at the lower few feet up from the garage floor.[3]

Harkins contacted its waterproofing subcontractor who, in turn, contacted the manufacturer. The subcontractor and manufacturer investigated the situation and determined that the waterproofing system was adequate and that the likely cause of the water penetration was hydrostatic pressure caused by water accumulation at the base of the wall and under the floor slab. They recommended a two step approach: 1) check the underslab drainpipes for obstructions; and 2) use a chemical injection procedure to fill the shrinkage cracks.

Harkins implemented both recommendations. A few obstructions were observed in the underslab drainpipes and they were cleared. The water proofing subcontractor implemented the injection procedure recommended by the manufacturer.[4] The signs of moisture stopped appearing on the walls and to the best of Harkin's knowledge have not re-occurred since.

   (a) **The garage waterproofing does not meet the Contract requirements. Specifically and as documented in SK&A report dated October 11, 2010 the waterproofing was not protected from damage or joints and penetrations were not properly sealed as specified in Section 071700 Bentonite Waterproofing.**

The moisture penetration condition has been resolved. There are no water leaks occurring and the Owner has been provided with the contractually required five year warranty. That is what the Owner bargained for and that is what it has received.

Exhibit 14 is a report dated October 29, 2010 from ECS Mid-Atlantic, LLC ("ECS"). ECS inspected the below grade waterproofing as it was being installed. As you can see, based upon first-hand observations, ECS has concluded unequivocally that "the installation of the waterproofing was consistent with industry standards and complied with the Contract Documents and manufacturer's warranty requirements."

The SK&A report does not provide any basis for concluding otherwise. *See* Exhibit 15 hereto.

   (b) **The Warranty provided does not meet the requirements of Section 071700 in that it includes terms, conditions, and obligations of the Owner not permitted by Section 071700, ¶ 1.9.**

---

[3] There was also an unrelated situation in which some water was observed at a through-wall pipe penetration. The pipe gasket at that location was adjusted, the water infiltration stopped, and to the best of Harkins's knowledge has not re-occurred since.

[4] At one point, the Owner directed Harkins to stop the injection procedure and asked for information about it. Harkins provided the requested information and the Owner thereafter authorized Harkins to continue.

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 5

The Owner contracted for a for a five year warranty against water infiltration and defects of materials and workmanship. The Owner was given a five year warranty against water infiltration and defects of materials and workmanship. The Owner has not identified the terms, conditions, and obligations of the Warranty that it contends are not permitted under Section 071700, ¶ 1.9. Harkins will reserve further comment on this point until the Owner has done so.

(c) **The recommendations in SK&A's report dated October 11, 2010 (copy attached as Exhibit 2) are appropriate measures to ameliorate the deficient installation.**

The first of the recommendations set forth in the SK&A Report is for a yearly inspection to identify any leaks that may develop in the future. Presumably, this recommendation is directed toward the Owner rather than Harkins.[5]

Another SK&A recommendation is for the installation of negative-side waterproofing on the inside surfaces of the building foundation walls. That system could be installed, but it would be an extra under Harkins's contract with the Owner for which Harkins would be entitled to be paid. Simply put, the contract does not call for negative side waterproofing.

The basis for SK&A's recommendation for negative side waterproofing is its assertion that "[t]he chemical grout application though functional now could potentially fail prior to the end of the five year warranty." SK&A does not provide any factual basis for that assertion. More importantly, however, the "logic" of the recommendation is fatally flawed. If the chemical grout fails within the warranty period, it will have to be repaired under the warranty. Under those circumstances, the Owner will have received what it paid for under the contract without the addition of the negative-side waterproofing that is not called for under the contract.

The SK&A Report also suggests that the warranty be extended "beyond the five year contract warranty." Obviously, however, the architect has no authority to impose obligations on the contractor that are admittedly outside of the contract.

The last of the recommendations set forth in the SK&A report is to "[r]out and seal cracks in the ground floor slabs with a flexible urethane caulk sealant to prevent the ingress of road salts, a known cause of deterioration in concrete structures." This recommendation is also apparently directed to the Owner rather than Harkins. The issue is wholly unrelated to the waterproofing and the SK&A Report does not contain any indication that SK&A considers it to be the result of anything that Harkins did or failed to do.

(d) **The value of the deficient waterproofing provided by Harkins is less than that which would be due under the Contract for a compliant installation for reasons of, among other things, the diminished quality of any "waterproofing", additional periodic maintenance, and the increased risk of future leaks accompanied by further damage from such leaks.**

The waterproofing is not deficient. As set forth in the October 29, 2010 from ECS Mid-Atlantic, LLC ("ECS") "the installation of the waterproofing was consistent with industry standards and complied with the Contract Documents and manufacturer's warranty requirements." There is no diminished value. The moisture penetration condition has been resolved. There are no water leaks occurring and the Owner has been provided with the contractually required five year warranty. That is what the Owner bargained for and that is what it has received.

(e) **As a result of the failed waterproofing, the Owner requests that a diminished value of $286,277.98 (the waterproofing subcontractor's contract price) be reimbursed to the Owner.**

---

[5] Harkins did not contract to provide such yearly inspections.

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 6

There is no diminished value. The moisture penetration condition has been resolved. There are no water leaks occurring and the Owner has been provided with the contractually required five year warranty. As set forth in the October 29, 2010 from ECS Mid-Atlantic, LLC ("ECS") "the installation of the waterproofing was consistent with industry standards and complied with the Contract Documents and manufacturer's warranty requirements." That is what the Owner bargained for and that is what it has received. In addition, please note that the full value of the garage waterproofing was $67,573, not $286,277.98. *See* Exhibit 16. The difference between that value and the total subcontract price is for the green roof, elevator pit, and other scope items.

        (f)    **The Owner also requests that Harkins provide a prepaid inspection and maintenance agreement that will identify and repair any leaks over the next 20 years.**

The contract calls for a five year warranty and that is what was provided. Harkins did not agree to provide a prepaid 20 year inspection and maintenance agreement. The architect has no greater authority to impose that obligation upon Harkins than Harkins has to force Compu.Tecture to enter into a contract with a third party to provide design services free of charge.

3.      Windows

In its December 3 Claim Letter, the Owner asserts:

*We refer Compu.Tecture to the Contract and Specification Section 085113, and Change Order number 25 regarding the requirements for windows.*

*As you know, in or about January 2010, the Owner was notified that the windows were not properly manufactured and did not include the factory installed concealed weathertight sealants. Harkins was notified that 100% testing of the windows was required. In response to the identification of the defective windows, Harkins elected to attempt to remediate the defective windows, rather than removing and replacing the windows with compliant units as required by the Specifications. As part of its remediation efforts, Harkins also represented that it would provide a 10 year warranty bond, but has not. Absent such bond, the Owner believes it is reasonable to test and inspect all windows.*

*Harkins' letter of November 12, 2010 asserts that any issues with regard to the windows are a warranty issue.*

*Accordingly, the Owner requests Compu.Tecture to approve its claim that:*

        *(a)    The windows as furnished and installed do not meet Contract requirements, and specifically the windows' joints were not factory assembled with factory installed concealed weathertight sealants in accordance with Section 085113 Aluminum Windows, Parts 2.3.K and 2.6.A.*

        *(b)    Harkins has not provided documentation that the windows meet the specified HC70 rating.*

        *(c)    100% testing of the windows is required.*

        *(d)    Harkins has not provided the 10 year warranty bond that was part of the remediation of the manufacturing defects rather than removing and replacing the windows with complaint units.*

        *(e)    The value of the field-remediated windows is less than that which would have been due under the Contract.*

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 7

> *(f) The Owner requests that a diminished value be assessed, and will provide further documentation as to the specified amount.*

As set forth below, the Owner's claim must be denied.

The test reports from National Certified Testing Laboratory are included as Exhibit 17. They establish that the field remediated windows meet the requirements of the contract Specifications.

**(a) The windows as furnished and installed do not meet Contract requirements, and specifically the windows' joints were not factory assembled with factory installed concealed weathertight sealants in accordance with Section 085113 Aluminum Windows, Parts 2.3.K and 2.6.A.**

As a result of the remediation, the windows have concealed weather tight sealants. Section 085113 does not require that the concealed weather tight sealants be factory installed or that such sealants cannot be installed in the field.

The test reports from National Certified Testing Laboratory (Exhibit 17) establish that the field remediated windows meet the requirements of the contract Specifications. The Owner has not presented any evidence that even remotely suggests otherwise.

**(b) Harkins has not provided documentation that the windows meet the specified HC70 rating.**

The test reports from National Certified Testing Laboratory (Exhibit 17) establish that the field remediated windows meet the requirements of the contract Specifications. If there is a submittal of some type that you believe is required by the contract that Harkins has not provided, please let us know so we can address the issue.

**(c) 100% testing of the windows is required.**

Testing of the windows was excluded under the contract (*see* Exhibit 18) and Harkins did not agree to test 100% of the windows as part of the remediation.

**(d) Harkins has not provided the 10 year warranty bond that was part of the remediation of the manufacturing defects rather than removing and replacing the windows with compliant units.**

The contract does not require a 10 year warranty bond and Harkins did not agree to provide a 10 year warranty bond in connection with the remediation.

**(e) The value of the field-remediated windows is less than that which would have been due under the Contract.**

The test reports from National Certified Testing Laboratory establish that the field remediated windows meet the requirements of the contract Specifications. The Owner has not presented any evidence that even remotely suggests otherwise.

**(f) The Owner requests that a diminished value be assessed, and will provide further documentation as to the specified amount.**

The test reports from National Certified Testing Laboratory establish that the field remediated windows meet the requirements of the contract Specifications. The Owner has not presented any evidence that even remotely suggests otherwise.

4. Roof

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 8

In its December 3 Claim Letter, the Owner asserts:

*We refer Compu.Tecture to the Contract and Specification Section 075200 and the approved submittals.*

*Harkins has not conducted or provided the Owner with evidence of the required testing set forth in the Specifications for the roof. Harkins alleges that the roof work is complete and that any further issues are warranty items.*

*Accordingly, the Owner requests Compu.Tecture to approve its claim that:*

*(a) The Contractor is required to provide the Owner with a test, or evidence that such has been conducted, consistent with Specification Section 075200, Modified Bituminous Built-up Roofing. Furthermore, the roof is to be warranted against bare spots per Section 07500, Part 1.9.A.1.d.*

*(b) Harkins has not submitted evidence required by the Contract Documents that the roof has been inspected and approved by the manufacturer as required by Section 075200, Part 3.4.*

*(c) The roof warranty furnished by Harkins is non-complaint with the "Special Warranty" requirements of Section 075200, Part 1.9. Furthermore the warranty as issued starts months prior to Substantial Completion and there is no evidence that its conditions precedent to effectiveness have been satisfied.*

As set forth below, there is no basis for granting any of these requests.

(a) **The Contractor is required to provide the Owner with a test, or evidence that such has been conducted, consistent with Specification Section 075200, Modified Bituminous Built-up Roofing. Furthermore, the roof is to be warranted against bare spots per Section 07500, Part 1.9.A.1.d.**

The Owner has not specified the basis for its contention that Harkins has not submitted evidence required by Section 0075200 or for its contention regarding bare spots. Harkins will reserve comment until the Owner has done so.

(b) **Harkins has not submitted evidence required by the Contract Documents that the roof has been inspected and approved by the manufacturer as required by Section 075200, Part 3.4.**

The Owner has not specified the basis for its contention that Harkins has not submitted evidence required by Section 0075200, Part 3.4. Harkins will reserve comment until the Owner has done so.

(c) **The roof warranty furnished by Harkins is non-compliant with the "Special Warranty" requirements of Section 075200, Part 1.9. Furthermore the warranty as issued starts months prior to Substantial Completion and there is no evidence that its conditions precedent to effectiveness have been satisfied.**

The Owner has not specified the basis for its contention that the roof warranty is non-compliant with the requirements of Section 075200, Part 1.9. Harkins will reserve comment until the Owner has done so.

5. Stairwell doors.

In its December 3 Claim Letter, the Owner asserts:

Pelin Atasoy
Mutesh Atasoy
Compu.Tecture PLLC
December 10, 2010
Page 9

> *We refer Compu.Tecture to the Contract, including the Drawings and section 3.7.4 of the General Conditions. Harkins alleges that the stairwell doors were located per the dimensions on the Contract Drawings and sketches issued by the Architect. Harkins, however, does not dispute that the doors do not meet Code requirements, including ADA requirements. The Owner asks that Compu.Tecture approve its claim that the stair doors are not installed per the Contract Documents including applicable ADA Code requirements. Furthermore, Harkins has refused to repair the conditions in accordance with ASK286 dated July 28, 2010 and is now liable for the costs incurred by the Owner in performing that work.*

As set forth below, the Owner's claim must be denied.

The stairwell doors were located in accordance with the dimensions set forth on the Contract Drawings. *See* Exhibit 19 hereto. The Owner has not presented any evidence that indicates otherwise.

The Owner has not presented any evidence to support its claim that the stairwell doors do not meet Code requirements, including ADA requirements. Harkins will reserve further comment on this point until the Owner has done so.

Section 3.7.3 of the General Conditions specifically provides: "It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations." Hence, if it is determined that a change is necessary, Harkins would be entitled to additional compensation.

The work set forth on ASK 286 dated July 28, 2010 changes the dimensions set forth on the Contract Drawings. *See* Exhibit 20 hereto. However, the Owner has not issued a Construction Change Directive for the work set forth on ASK 286. As such, the Owner cannot be heard to complain that Harkins is obligated to perform the work. Indeed, at this point, Harkins is not even authorized to do so.

The Owner does not and cannot allege that Harkins performed any the Work knowing that it was contrary to Code requirements. Therefore, Section 3.7.4 of the General Conditions (which is referenced by the Owner in its December 3 Claim Letter as the basis for this claim) is not applicable. By its express terms, Section 3.7.4 applies only "[i]f the Contractor performs work knowing it to be contrary to laws, statutes, [or] building codes...."

Very truly yours,

Richard M. Lombardo

RML/

cc: Timothy M. Chapman
    Jason Iannotti