**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **2300 PENNSYLVANIA AVENUE, LLC** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 1:10cv1321-LOG-IDD** |
| ) | |
| **HARKINS BUILDERS, INC.** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff 2300 Pennsylvania Avenue, LLC ("Plaintiff" or "Owner"), by counsel, hereby

submits its Reply to Defendant Harkins Builders, Inc. ("Defendant," "Contractor" or

"Harkins")'s Opposition to Plaintiff's Motion for Partial Summary Judgment.

**INTRODUCTION**

The issues presented in the Owner's Motion may be resolved purely as a matter of

contract interpretation, and Harkins' Opposition essentially concedes as much.  Rather than

offering evidence to demonstrate the existence of any genuine issue of material fact, Harkins

asks the Court to alter the express terms of the parties' Contract so as to read out several of the

Contract's fundamental and bargained-for provisions and to replace them with wholly new terms

and conditions that simply do not exist within the written agreement.  As in Virginia, however,

District of Columbia law does not permit the Court to make a new contract for the parties.

Nonetheless, no longer happy with the deal it struck with the Owner, Harkins asks the

Court, here, to read a materially different agreement into the Contract that conflicts with the

plain and unambiguous terms of the parties' actual Contract.  More specifically, having failed to

achieve Substantial Completion within the Contract Time, and in a desperate attempt to escape its clear contractual liability for liquidated damages, Harkins now asks the Court to find a new agreement that equates an the ability to occupy with the Contract milestone of Substantial Completion, notwithstanding the several Contract provisions that differentiate between the requirements for, and consequences of, these two separate and distinct events.  In doing so, Harkins asks the Court to ignore, inter alia, Contract provisions that tie liquidated damages to Substantial Completion, rather than to mere occupancy.  Harkins also asks the Court to read out of the Contract those provisions that specifically allow the Owner to occupy the building, in whole or in part, prior to Substantial Completion.  Harkins also asks the Court to ignore the parties' express agreement to have the Architect determine the date of Substantial Completion, as well as the several Contract provisions that delineate how the Architect is to make such a determination.  Harkins further asks the Court to ignore the express language set forth in Change Order No. 91, whereby the parties amended the Contract to provide for a "Certificate of Occupancy bonus" and not the "Substantial Completion Incentive Bonus" requested by Harkins. In light of these and other Contract provisions that distinguish Substantial Completion from occupancy, Harkins' flawed main premise that a Certificate of Occupancy and the Architect's Certificate of Substantial Completion are "one in the same" under the terms of the Contract not only contradicts the plain terms of the Contract, but it undermines Harkins' entire opposition to the Owner's claim of entitlement to liquidated damages.  (See Opp. at 6 n.8.)

Harkins also asks the Court to ignore a number of other clear and unambiguous Contract terms, including but not limited to (i) several conditions precedent to final payment; (ii) the procedures required for obtaining time extensions; and (iii) provisions rendering Harkins responsible for the work of its subcontractors.  In each of such instance, Harkins' contentions may and should be rejected as a purely legal matter of contract interpretation.

2

Significantly, Harkins has admitted all facts material to the resolution of the issues presented in the Owner's Motion. Specifically, as to the Owner's claim of entitlement to liquidated damages, Harkins has not disputed that (i) the Contract imposes liquidated damages for each day of delay beyond the adjusted Contract Time until Substantial Completion is achieved; (ii) the Contract Time expired on April 25, 2010; and (iii) the Architect certified that the Project was Substantially Complete on August 2, 2010.   As to the dismissal of Harkins' Counterclaim, Harkins has effectively conceded that it did not, prior to filing its Counterclaim, satisfy certain conditions precedent under the Contract, including but not limited to (i) supplying certain contractually-required warranties—two of which were not provided until THIS WEEK; (ii) accepting its responsibilities under the Architect's Certificate of Substantial Completion; and (iii) performing certain outstanding punchlist items.   Under the foregoing undisputed facts, alone, the Owner is entitled to judgment as a matter of law.

## FACTS NOT IN DISPUTE

Under Local and Federal Rules 56, Harkins is required to produce competent admissions or evidence to establish that any of the facts set forth in the Owner's initial statement of Undisputed Facts are genuinely in dispute.  Those of the Owner's Undisputed Facts that are not specifically refuted are deemed admitted.   Under these Rules, the universe of unrefuted Undisputed Facts at minimum includes, paragraphs 1-66 and 72-75 from the Owner's initial brief.  Harkins claims that it also disputes the statements in paragraphs 42, 47, 55, 57, 65-66 and 72-75, but in each case, Harkins's response either (i) fails to deny or otherwise meet the substance of the stated fact (42, 47, 57, 65-66, 72, 74-75); (ii) fails to provide competent evidence to controvert the fact (see ¶ 55); or (iii) actually admits the Undisputed Fact (see ¶¶ 65, 73).  Significantly, Harkins has failed to explain how any genuinely disputed fact, if resolved in Harkins' favor, would require denial of the Owner's Motion.  Harkins has not submitted a Rule

56(d) declaration/affidavit, and, thus, it does not require further discovery regarding this Motion.

**I.      Under the Contract, the Benchmark for Determining Liquidated Damages Is the Date of Substantial Completion Certified by the Architect and <u>Not</u> When a Certificate of Occupancy Issues or Any Other Date Selected by Harkins**

In a misguided attempt to trivialize the significance of the Architect's certification of Substantial Completion, Harkins argues that "2300's only basis for [its claim of entitlement to liquidated damages] is that the Architect issued the Certificate of Substantial Completion on August 2, 2010."   As this Court noted in the <u>Comstock</u> decision, the effective date of the Architect's Certificate of Substantial Completion under the AIA form Contract at issue in both cases is by no means a trivial event—rather, it is the "benchmark" for determining the duration for which liquidated damages are imposed.   <u>See</u> <u>Comstock Potomac Yard v. Balfour Beatty Constr., LLC</u>, 694 F. Supp. 2d 468, 484 (2010).   Significantly, Harkins does not dispute either that liquidated damages are determined by the date of Substantial Completion or that the Architect determined that August 2, 2010 is the effective date of Substantial Completion. Harkins asks the Court to ignore the significance that the Contract places upon the Architect's Certificate of Substantial Completion and to focus, instead, upon a different event: the issuance by a public authority of a Certificate of Occupancy.   As such, Harkins asks the Court to replace the procedure expressly agreed to by the parties for determining the effective date of Substantial Completion with a different procedure not agreed upon in the Contract.   Such a substitution of Contract terms is not permissible under District of Columbia law.

**A.      District of Columbia Law Requires Enforcement of the Contract as Written**

As the Court of Appeals for the District of Columbia has made clear, the District applies the so-called "objective law" of contracts in resolving issues of contract interpretation, whereby the court must, in the first instance, rely solely upon the terms of an unambiguous contract, as the

best objective manifestation of the parties' intent.  See <u>District of Columbia v. D.C. Pub. Serv.</u>

<u>Comm.</u>, 963 A.2d 1144, 1155 (2009) (<u>citing</u> <u>Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.</u>,

475 A.2d 382, 385 (D.C. 1984)).  Additionally, the "writing must be interpreted as a whole,

giving a reasonable, lawful and effective meaning to all of its terms."  <u>Id.</u> (<u>quoting</u> <u>Potomac</u>

<u>Assocs. v. Grocery Mfrs. of Am., Inc.</u>, 485 A.2d 199, 205 (D.C. 1984)).  In contrast, the courts

are not at liberty to reform the parties' agreements. <u>Id.</u> at 1158.

### B.    Harkins' Proposed Procedure for Determining Substantial Completion Is Unsupported by the Plain Terms of the Contract

As set forth in the Owner's opening brief, the Contract expressly provides that the date of

Substantial Completion "is the date Certified by the Architect."  (Chapman Aff. Ex. B § 8.1.3.)

In this regard, the Contract provides a specific process whereby the Architect determines the

effective date of Substantial Completion, <u>following</u> its inspection and determination that all

necessary Work has been performed in accordance with the Contract Documents and <u>after</u> the

Contractor has corrected any Work required by the Architect in connection with this inspection.

(<u>See</u> Chapman Aff. Ex. B §§ 4.2.9, 8.1.3, 9.8.3, 9.8.4.)   Specifically, for example, General

Conditions § 9.8.3 provides:

> [i]f the Architect's inspection discloses any item…which is not sufficiently
> complete in accordance with the Contract Documents so that the Owner
> can occupy or utilize the Work or designated portion thereof for its
> intended use, the Contractor shall, before issuance of the Certificate of
> Substantial Completion, complete or correct such item…

(Chapman Aff. Ex. B § 9.8.3).  Harkins simply refuses to acknowledge such Contract provisions

and, in derogation of District of Columbia law, declines to consider the Contract as a whole.

Rather, in asserting its erroneous contention that Substantial Completion is synonymous

with, and should be determined solely by, occupancy, Harkins improperly focuses upon but one

portion of a single Contract provision, to the exclusion of numerous relevant and fundamental

Contract provisions that contradict Harkins' contention.   Specifically, Harkins focuses exclusively upon the following underlined language from Contract General Conditions § 9.8.1:

> <u>Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete</u> in accordance with the Contract Documents <u>so that the Owner can occupy or utilize the Work for its intended use</u>.

(Emphasis added.)  By confining its analysis of the requirements for Substantial Completion to the underlined portion of § 9.8.1, Harkins effectively asks the Court to ignore the parties' express agreement to have the Architect determine the effective date of Substantial Completion as well as most of the Contract's provisions governing how that determination is to be made.  Indeed, Harkins even ignores significant language from § 9.8.1 requiring that the Contractor complete the Work "in accordance with the Contract Documents."  In this regard, Harkins admits, as it must, but attempts to minimize the fact that, its windows were not "fully compliant with the requirements of the contract."[1]  Unfortunately for Harkins, that the Work must be completed in conformity with the Contract's requirements is a condition precedent to Substantial Completion.

Additionally, under the Contract, a Certificate of Occupancy is not, as Harkins contends, equivalent to the Architect's Certificate of Substantial Completion.   If the parties intended for a Certificate of Occupancy to trigger all of the contractual obligations that the Contract attaches to the Architect's certification of Substantial Completion, (<u>see</u> Chapman Aff. Ex. B § 9.8.4), they could have easily substituted the former term in place of the latter.  The parties did not, however, make such a substitution.  Rather, the parties clearly expressed their intent to confer upon the Architect the authority to determine Substantial Completion, through the Contract's prescribed certification process, and to tie liquidated damages and other contractual responsibilities to the date certified by the Architect in accordance with that process.  (<u>See</u> Chapman Aff. Ex. A § 3.3

---

[1] Opp. at 3 n.3.

and D at Revised Contract Exhibit H.)

Moreover, the fact that the Owner received keys to the Project's units and allowed tenants to occupy a portion of the units does not, as Harkins argues, satisfy the Contract's requirements for Substantial Completion.   Rather, and significantly, the Contract clearly contemplates that the Owner may occupy the building, in whole or in part, prior to the Contractor's achievement of Substantial Completion.   (See, e.g., Chapman Aff. Ex. B § 9.6.6, 9.9.1, 9.9.3.)  Specifically, for example, the Contract General Conditions provide:

> …partial occupancy or use may commence whether or not a portion of the Work is substantially complete… (Chapman Aff. Ex. B § 9.9.1)
>
> A Certificate for Payment, a progress payment, or partial or entire occupancy of the Project by the Owner shall not constitute acceptance of the Work not in accordance with the Contract Documents.  (Id. § 9.9.3.)

(Emphasis added.)  Under these and other provisions, the Contract does not support Harkins' overly simplistic analysis that the mere ability to occupy certain units equates to Substantial Completion.

Inasmuch as District of Columbia law requires a contract to be interpreted as a whole, giving a reasonable, lawful and effective meaning to all of its terms, Harkins' proposed interpretation, which fails to account for nearly all the Contract's provisions that address the establishment of the date of Substantial Completion, must be rejected.

## C.   The Case Law Relied Upon by Harkins Is Inapplicable

Finding no support from any case within the District, Virginia or anywhere within the Fourth Circuit for its self-serving contention that the Court should ignore the express provisions of the Contract, Harkins reaches far and wide, from New York to Guam, in an attempt to identify relevant authority.  Specifically, Harkins attempts to identify authority to support the erroneous proposition that the issuance of a certificate of occupancy effectively establishes substantial

completion where the parties have contractually agreed to have their designated architect determine the effective date of substantial completion. Notwithstanding the vast geographical expanse of its search, Harkins fails to cite a single case that embraces the material issues presented here.

The <u>Landow</u>[2] case from New York, for example, provides no discussion of the terms of the contract, and therefore it is impossible to discern whether, among other things, the subject contract conditioned substantial completion upon an architect's issuance of a corresponding certificate or whether any liquidated damages were even at issue in the case. The <u>Healy</u>[3] decision from Delaware's Court of Common Pleas is similarly unhelpful in that none of the parties even argued that the date of substantial completion occurred after the certificate of occupancy issued. The <u>Avery</u>[4] decision from Guam is readily distinguishable in that, among other things, the contract did not tie liquidated damages to an architect's determination of substantial completion. The <u>J. M. Beeson</u>[5] case from Florida actually undermines Harkins' position in that that court held, in a case involving the same certification of substantial completion provision at issue in this case, that the certificate of occupancy should only be used to indicate substantial completion where there was no supervising architect on the project. And finally, the cited text from the <u>Perini</u>[6] decision is pure <u>dicta</u>, and that court enforced an arbitration award against the contractor even where the contractor argued that it had reached substantial completion prior to being terminated.

In sum, none of the cases relied upon by Harkins is relevant here in that, among other

---

[2] <u>Landow & Landow Architects, P.C. v. Shorefront Jewish Geriatric Ctr.</u>, 289 A.D.2d 492, 493 (N.Y. App. Div. 2001).
[3] <u>Healy v. Silverhill Constr., Inc.</u>, 2009 WL 295391 (Del. Com. Pl. 2009).
[4] <u>B.M. Co. v. Avery</u>, 2001 WL 1658197 (Guam 2001).
[5] <u>J.M. Beeson Co. v. Sartori</u>, 553 So.2d 180 (Fla. Dist. Ct. App. 1989).
[6] <u>Perini Corp. v. Greater Bay Hotel & Casino, Inc.</u>, 610 A.2d 364 (N.J. 1992).

things, none involves a case in which a contract called for an architect's determination of substantial completion and wherein the architect issued a certificate of substantial completion, as is the case here.  More importantly, none of these cases establishes that a court should ignore the architect's certification of substantial completion in favor of some alternate standard.

### D.   Harkins' Contention That the Corrective Work on Windows Did Not Delay Substantial Completion Also Ignores the Plain Contract Terms

Harkins' erroneous contention that its corrective work on the windows did not delay its achievement of substantial completion simply ignores the plain terms of the Contract.  As explained above and in the Owner's opening brief, the Contract provides a specific procedure whereby the Architect determines the date of Substantial Completion.  Harkins' argument regarding its corrective work constitutes nothing more than a repackaging of its previously asserted erroneous argument that the Owner's ability to occupy the building equates to Substantial Completion.  As explained above, this argument must be rejected as it fails to give meaning to nearly every Contract provision that addresses Substantial Completion.

In this regard, it is clear from, among other things, the face of the Architect's Certificate of Substantial Completion (see Chapman Aff. Ex. I) and the Architect's December 30, 2010 written response to the Owner's claim submission (see Evans Aff. Ex. 22 at 3-4) that the Architect refused to certify the Project as Substantially Complete, as defined by the Contract, until the windows had been fully remediated.  As discussed in further detail in Section I.F, below, the Architect has explained that a certificate of occupancy should not have issued if the building inspector was aware of the leaky and defective windows.

Significantly, this determination finds support in the D.C. Housing Codes and Regulations, which provide, inter alia, that no certificate of occupancy shall be issued where the structure does not comply with requirements set forth in the building codes and regulations.  See

C.D.C.R. 14-1400, Housing, Certificate of Occupancy: Rules and Procedure, §1402.4, Exhibit 2

hereto.   Applicable building code and regulation requirements include that

> Each window shall be fully supplied with window panes which are without cracks
> or holes.  C.D.C.R. 14-700, Housing, Housing Code: Construction, Maintenance
> and Repairs, Windows and Doors, §705.1;

> All windows, doors, and their frames shall be constructed and maintained in
> relation to each other and to wall construction to do the following: (a) exclude
> rain completely from entering the structure; and (b) exclude wind substantially
> from entering the structure.   C.D.C.R. 14-700, Housing, Housing Code:
> Construction, Maintenance and Repairs, Windows and Doors, §705.6; and that

> Each window sash shall be in good condition and shall fit reasonably well within
> its frame.  C.D.C.R. 14-700, Housing, Housing Code: Construction, Maintenance
> and Repairs, Windows and Doors, §705.2.

The foregoing provisions demonstrate that neither a Certificate of Occupancy, much less a

Certificate of Substantial Completion should have issued before the windows were brought into

compliance with Contract specifications proved to be non-defective.  Thus, Harkins' reliance on

the Certificate of Occupancy is truly misplaced.

Moreover, any suggestion by Harkins that the impact of the window defects and the

magnitude of the remediation effort after January 2010 was marginal (which suggestions are

merely implied and unsupported by any specific assertions or evidence), is completely

inconsistent with Harkins' own specific admissions.  Indeed, it is undisputed that 100% of the

windows required remediation after April 2010.  (See Chapman Aff. Exs. E-H).  In this regard,

any implied suggestion that the windows were not susceptible to leaks after January 2010 or

even after April 2010 is completely contradicted by unrefuted evidence offered in support of the

Owner's Motion that an issue with dripping sashes discovered in May 2010 required replacement

of all window sashes throughout the Project.   Id.   Moreover, while Harkins' Opposition

misleadingly implies that the most significant corrective work was performed in January 2010,

Harkins cannot escape its admission that all of those repair efforts "failed to resolve the water

leaks." (Harkins Am. Compl. v. Caffes-Steele ¶8, Ex. 3 to Owner's Memo.; <u>see also</u> Undisputed Facts ¶ 40.) Indeed, it is beyond dispute that Caffes-Steele and Wojan did not even provide the Owner with the remediation plan for the windows that was actually implemented on the Project before April 2010. (Iannotti 2d Aff. ¶ 6.)[7] It is further undisputed that Harkins has asserted a claim and filed a lawsuit against its window installer, Caffes-Steele, seeking over $1 million in delay damages and other damages associated with its "extensive program of investigation and remediation," much of which, as Harkins admits, occurred between March 25 and July 27, 2010. (Undisputed Facts ¶¶ 46, 48, 49.) As Harkins further admits, its claims against Caffes-Steele include nearly $350,000 in damages for delays sustained through September 24, 2010, approximately five months after the Contract Time expired, or for an additional period longer than 25% of the original Contract Time. (<u>Id.</u> ¶¶ 47-48; <u>see also</u> Iannotti Aff. Ex. A.)

Regardless, neither Harkins' nor the Owner's opinions regarding whether Harkins' corrective work delayed Substantial Completion is dispositive. Harkins and the Owner agreed in their Contract to have the Architect make that determination, and there is no dispute that the Architect certified that the Project was Substantially Completed on August 2, 2010.

### E.     As with the Original Contract Documents, Harkins Ignores the Plain Terms of Change Order No. 91

Harkins erroneously contends that the Owner's payment to Harkins of $150,000 under Change Order No. 91 constitutes evidence that Harkins achieved substantial completion of the Project by March 25, 2010. Harkins' two-sentence argument is entirely misleading, ignores the plain terms of the subject Contract Documents (<u>i.e.</u>, the undisputed modification to the Contract by Change Order No. 91), which contradicts Harkins' position, and improperly attempts to equate a Certificate of Occupancy with the Architect's Certificate of Substantial Completion.

---

[7] A true and correct copy of Second Affidavit of Jason Iannotti ("Iannotti 2d Aff.") is attached as Exhibit 1 hereto and incorporated by this reference as though fully set forth herein.

As referenced by Harkins, the Revised Contract Exhibit H implemented by Change Order No. 9 provided for payment of $150,000 if substantial completion was reached by March 25, 2010. However, as is evident from, among other things, the face of the Architect's Certificate of Substantial Completion, Harkins did <u>not</u> achieve Substantial Completion by March 25, 2010. Notwithstanding, as Harkins acknowledges, Harkins requested a "Substantial Completion Incentive Bonus" by submission of a pending change order ("PCO") No. 91, which is attached as Exhibit 10 to Harkins' Evans Affidavit. As Harkins is well aware, this PCO was the subject of back and forth negotiations between representatives of the Owner and Harkins, including their respective counsel, in light of the fact that Substantial Completion had not been certified by the Architect as of March 25, 2010. At the conclusion of such discussions, the parties executed Change Order No. 91, which, by no accident, did not include the language from PCO No. 91, "Substantial Completion Incentive Bonus." Rather, Change Order No. 91, as negotiated, provided for payment to Harkins of a "Certificate of Occupancy bonus," in light of the fact that a Certificate of Occupancy had issued but a Certificate of Substantial Completion had not.[8] A simple side-by-side comparison of the unexecuted PCO No. 91 and the fully executed Change Order No. 91 reveals, in no uncertain terms, that the parties ultimately intended to recognize the Certificate of Occupancy but <u>not</u> Substantial Completion. (<u>See</u> Evans Aff. Exs. 10 and 11.)

Effectively conceding the point, Harkins once again argues that there is no contractual difference between a Certificate of Occupancy and the Architect's Certificate of Substantial Completion. If that were truly the case, there would be no reason to change the language submitted by Harkins in its PCO. The final change in the language underscores the distinction.

As an additional tactic, rather than acknowledging the plain language of the fully

---

[8] Of course, at that time, the Owner had no way of knowing that the window remediation was going to require more than four additional months to complete.

executed Contract Order, Harkins attempts to introduce testimony from its Project Manager regarding his subjective contemporaneous understanding at the execution of the Change Order that would contradict the plain language of the unambiguous writing.  See Evans Aff. ¶ 42.  This proposed testimony must <u>not</u> be considered in that its admission would violate the parol evidence rule, as recognized in the District, <u>see, e.g.</u>, <u>Potomac Assocs. v. Grocery Mfrs. of Am., Inc.</u>, 485 A.2d 199, 205 (D.C. 1984) ("[e]xtrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous."), and because proffered evidence that would not be admissible at trial may not be considered on summary judgment.   <u>See</u> Fed. R. Civ. P. 56(c)(2).

> **F.      No Claim Disputing the Architect's August 2, 2010 Certified Date of Substantial Completion Was Ever Properly Submitted through the Contract's Dispute Procedures and the Architect's Reasoned <u>Determination of the August 2, 2010 Date Remains Undisturbed</u>**

Harkins' contention that the Architect's determination of the Substantial Completion date should be nullified by its failure to render a final decision in its December 30, 2010 response to the Owner's December 3, 2010 claim is improperly premised upon Harkins' mischaracterization of both the Owner's claim and the Architect's response.  Similarly, Harkins' argument that the Court must now determine the effective date of Substantial Completion based upon the Architect's refusal to render a decision in its December 30, 2010 response is similarly unsupported by the relevant documents.

Harkins' entire argument, here, depends upon the flawed premise that the Owner, through the Contract's dispute provisions, submitted a claim whereby it requested the Architect to revisit and confirm the certified date of August 2, 2010.  As is evident from the face of the Owner's December 3, 2010 submission, however, the Owner never asked the Architect to confirm, revisit, or resolve any issue regarding the August 2, 2010 date.  Rather, the Owner merely asked the Architect to approve and quantify its claim for liquidated damages.  See Evans Aff. Ex. 20.

While the Architect declined to render a full decision on the myriad claims and defenses alleged in the parties' respective submissions to the Architect in December 2010, in part because some legal issues "may" have been implicated, the Architect never wavered from its position that it certified Substantial Completion as of August 2, 2010.  In fact, the Architect fully explained its basis for determining its certified date in its December 30, 2010 response, stating, in part

> Harkins has not established that the DC inspectors were aware that the windows were leaking when an occupancy permit was issued.  In any event, Harkins was responsible for paying the window manufacturer and thus is responsible for any improperly manufactured windows.  The undersigned issued its substantial completion certificate on August 2, 2010, due to the fact that the windows leaked because they were defective upon installation.  The repair of the windows required substantial work, not only to the windows themselves, but to the surrounding drywall and insulation.
> …
> As indicated above the window fix plan [sic.] were changing as work progressed and we were not sure if this repair work would resolve the issues until all repair work and testing was completed.  The Window leak was a potential risk for structural walls.  There was also a risk of mold development in the wall cavities.  Even though some of the units were occupied the owner carried the risk of having to empty all units when replacing the windows.
>
> This is the reason substantial completion was not released when occupancy issued.

(Evans Aff. Ex. 22.)  Harkins fails and is unable to adduce any evidence that the Architect rescinded its determination of the August 2, 2010 Substantial Completion date, as none exists.

Moreover, as Harkins concedes in its Opposition, "the [C]ontract requires claims to be submitted within 21 days after occurrence of the event giving rise to such claim."  (Opp. at 12.)  Significantly, neither the Owner nor Harkins notified the Architect of any claim or dispute regarding the propriety of the date of Substantial Completion set forth in the Architect's Certification within 21 days of receipt thereof.  Accordingly, <u>Harkins is time-barred from disputing the Architect's August 2, 2010, certified date of Substantial Completion.</u>

**G.      Harkins Is Solely Responsible for Defective Work Performed by Its Subcontractors**

14

The Contract plainly establishes that Harkins is responsible for all materials, work and activities performed under its subcontracts, as well as for all Contract Work on the Project.  See Chapman Aff. Ex. B §§ 3.3.2, 3.5.1.  Assuming, arguendo, that the Owner exercised a contractual right to designate window installers and suppliers to be used by Harkins, Harkins was aware of such Contract rights at the time of its execution.  Harkins nonetheless executed the Contract and nonetheless freely and voluntarily entered into a bilateral subcontract with Caffes-Steele, whereby Caffes-Steele became obligated to Harkins to supply and install the specified windows on the Project.  A true and correct copy provided of the Caffes-Steel Contract that was produced in discovery, although with one-page missing is attached hereto as Exhibit 4.  Indeed, Harkins is pursuing its own claims against related to the windows against Caffes-Steele under its subcontract.  Under the Contract, Harkins is liable to the Owner for all work procured under its subcontracts, and Harkins cites no authority to the contrary.

**H.  Harkins Is Barred from Claiming Concurrent Delay**

Harkins is barred from claiming concurrent delay in that (i) Harkins failed to satisfy the Contract's notice and claim requirements for obtaining an extension of the Contract Time; and (ii) Harkins executed an express waiver of all such Contract claims.

The Contract sets forth clear notice and claims procedures whereby a Contractor can obtain an extension of the Contract Time if its progress is delayed by forces beyond its control and responsibility.  See Chapman Aff. Ex. B. §§ 8.3, 4.3.  All such claims must be initiated by written notice within 21 days of the occurrence giving rise to such claims.  It is undisputed that Harkins never made a claim under the Contract for concurrent delay regarding any of the sidewalks, perimeter sitework or marquees, within 21 days of the alleged occurrence of such events.  (See Undisputed Facts ¶ 51.)  Therefore, it is barred from making any such claim now.

Additionally, on or about August 20, 2010 Harkins's President, Richard Lombardo, executed a release that expressly waived, among other things, all prior Contract claims, which includes a waiver of any alleged prior concurrent delays.  (See Iannotti 2d Aff. ¶ 7, Ex. R.)

## II.   Harkins Concedes that It Has Not and/or at the Time of Filing Suit Had Not Satisfied All Conditions Precedent to Final Payment

It stands to reason that Harkins cannot claim final payment before it has fully performed its obligations under the Contract.  Notwithstanding, within a relatively short period of time following Substantial Completion, Harkins essentially stopped short of fulfilling its contractual obligations and is now demanding final payment.  Under the Contract, however, Harkins is not entitled to final payment unless and until it fully performs its Contract obligations.

As set forth in the Owner's opening brief, under the Contract, final payment clearly does not become due before: (i) the Contractor accepts the responsibilities assigned to it in the Certificate of Substantial Completion—i.e., the punchlist;[9] (ii) the Contractor provides written notice that the Work is ready for final inspection and acceptance; (iii) the Contractor provides a final application for payment; (iv) the Architect determines that all of the Contractor's obligations have been fully and properly performed; and (v) the Architect issues a final Certificate for Payment.  See Chapman Aff. Ex. B §§ 4.2.9, 5.2.1, 9.8.5, 9.10.1.  Specifically, for example, General Conditions § 9.10.1 provides:

> Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application of Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with the terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable.  The Architect's final Certificate for

---

[9] A true and correct copy of the punchlist is attached as Exhibit T to the 2nd Iannotti Affidavit.

> Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

(emphasis added.)  Thus, final payment is not due before the Contract is "fully performed."

In support of its Motion, the Owner previously identified numerous examples of ways in which Harkins failed to satisfy the express conditions to final payment under the Contract, including but not limited to its failure to accept its responsibilities under the punchlist, its failure to perform all of the punchlist items, its failure to provide certain warranties required to be provided under the Contract, its failure to submit a final payment application properly certifying that all of its Contract obligations had been completed and the lack of a certification of from the Architect, based upon a final inspection, that the Contract has been fully performed.

In response, Harkins has provided little more than an affidavit from its project manager, Jason Evans, which asserts, mostly in broad and non-specific terms, that Harkins has, in fact, satisfied many of the requirements that the Owner alleges were not satisfied.   Such representations are difficult to reconcile with the Owner's evidence.   Notwithstanding, putting all such "disputed" issues to the side, it is clear from Harkins admissions that it has not performed, and certainly at the time it filed its Counterclaim for the remaining Contract funds of $510,000 had not performed, several of its Contract obligations before seeking final payment.   As such, Harkins' claim for the final payment of the remaining Contract funds should be dismissed.

### A.   Failure to Accept Responsibilities under Substantial Completion Certificate

For instance, Harkins readily admits that it has not provided written acceptance of the responsibilities assigned to it under the Certificate of Substantial Completion.   The written acceptance is an express condition to any further payment under the Contract. (Chapman Aff. Ex. B § 9.8.5).  On such basis, alone, the Counterclaim is improper; at minimum, it is premature.

17

Because it cannot deny that it has failed to perform this requirement of the Contract, Harkins argues that it is not contractually obligated to perform some (but not all) of the items set forth on the Architect's punchlist as an excuse for its non-performance.  Of course, to argue that Harkins has no contractual obligation to perform a certain obligation is to create a legal question of contract interpretation rather than a disputed issue of fact.  Moreover, as explained above, the Contract provides a disputes provision, whereby Harkins could have initiated a claim disputing that it was obligated to perform such activities, provided that it initiated its claim within 21 days of its receipt of the punchlist.  It did not do so, however, and its time to dispute the propriety of the punchlist has since expired.   Therefore, its excuse for not signing the punchlist is invalid, and its failure to do so constitutes merely one way in which Harkins failed to fully perform the Contract.

### B.   Failure to Perform Punch List

Similarly, inasmuch as Harkins can no longer dispute the propriety of the outstanding punchlist items, it is required to perform the punchlist items as a condition to final payment. (Chapman Aff. Ex. B. § 9.10.1.)  In this regard, Harkins flatly concedes that it did not perform one of the punchlist items that it acknowledges it is required to perform—i.e., the relocation of a roof condenser.  Harkins claims that it is awaiting instructions from the Architect but offers no evidence to support its position that it requires or has asked for such direction.  Notwithstanding, and in contravention of the Contract, Harkins apparently believes it is entitled to final payment for its work prior to satisfying this obligation.

Two other punchlist items that Harkins concedes it has not performed involve the requests for information regarding the quality of the roof, as to which the Architect has observed certain potentially defective conditions.  Harkins responds that it has no obligation to provide the Architect with the requested information.  Here, too, the time for objecting to the propriety of the

18

punchlist has expired.  Notwithstanding, Harkins has failed to provide information that is required from the manufacturer regarding the modified bituminous roofing membrane.

With regard to punchlist requirement for HC-70 testing, Harkins offers the patently erroneous statement that it has provided "a final report that assures windows meet the HC-70 rating."  In support thereof, Harkins attaches in Exhibit 23 to the Evans Affidavit field test reports of Wojan and NCTL which state on the face of the reports that they are field tests (as opposed to lab tests) and that they are based solely upon water penetration tests only.  Pursuant to the applicable AAMA Specifications, which define the requirements for the HC-70 grade, the criteria that must be tested to confirm compliance includes, operating force testing, air leakage resistance tests, design pressure tests  and structural tests, in addition to water penetration tests. See Exhibit 3 hereto, AAMA 101, § 5.1.  Accordingly, from the face of the documents provided, it is clear that Harkins has failed to provide a certification that the field-remediated windows satisfy the minimum criteria for an HC-70 rating.[10]

### C.    Failure to Supply Warranties

In its opening brief, the Owner provided a list of outstanding warranties that Harkins is required to provide, under the Contract, and that the Owner has been requesting but which have not been provided.  The list of outstanding warranties included warranties for the hydrotech system and the joint sealants used on the Project.  Significantly, Harkins only provided those two warranties, for the first time, earlier this week, on February 21, 2011.  (Iannotti 2d Aff. ¶ 8.) Clearly, the Owner was not entitled to final payment prior to fulfilling its Contract obligations to provide warranties, and Harkins did not provide these required warranties prior to filing its Counterclaim.  On this basis alone, the Counterclaim must be dismissed.

Harkins has also failed to provide the Owner with proper warranty documents for the

---

[10] Moreover, the AAMA does not provide for field testing as a basis for product certification.

modified bituminous roofing membrane, as specifically required under the corresponding Contract Specification, § 075200, which the Owner previously included as part of an exhibit to the Iannotti Affidavit. In response, Harkins vaguely contends that it has provided "roofing" warranties but provides no evidence that it has provided all required roofing warranties or that it specifically provided all warranty documents required under § 075200. Harkins still has not satisfied its obligation to provide this warranty. Thus, it is not entitled to final payment.

### D. <u>Final Completion, Inspection and Certification</u>

Finally, as demonstrated above, Harkins has failed to fully perform its Contract obligations. Thus, the Architect cannot perform a final inspection or issue final Certificate of Payment. Final payment cannot become due before these and the other conditions set forth above are satisfied. Therefore, Harkins cannot maintain a claim for final payment of the remaining Contract Funds.

### <u>CONCLUSION</u>

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter an Order (i) declaring and/or adjudicating that Harkins is liable to Plaintiff for liquidated damages for each day of delay from the adjusted contract completion date to the substantial completion date certified by the Architect; (ii) ordering that Harkins cannot recover under its Counterclaim and dismissing Harkins' Counterclaim with prejudice.

Dated: February 24, 2011.                    Respectfully submitted,

/s/ Vivian Katsantonis
Vivian Katsantonis (VA Bar No. 30448)
Christopher M. Harris (VA Bar No. 48361)
WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 (telephone); (703) 893-8029 (facsimile)
vkatsant@wthf.com, charris@wthf.com
*Counsel for Plaintiff 2300 Pennsylvania Avenue, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February 2011, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Lucas F. Webster, Esquire
HUDDLES, JONES, SORTEBERG & DACHILLE, P.C.
10211 Wincopin Circle, Suite 200
Columbia, Maryland  21044
Tel: (301) 621-4120
Fax: (301) 621-4473
webster@constructionlaw.com

*Counsel for Defendant Harkins Builders, Inc.*

/s/ Vivian Katsantonis
Vivian Katsantonis (VA Bar No. 30448)
WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
Tel: (703) 749-1000
Fax:  (703) 893-8029
E-Mail:  vkatsant@wthf.com

*Counsel for Plaintiff 2300 Pennsylvania Avenue, LLC*