# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| **2300 PENNSYLVANIA AVENUE, LLC** | * | |
| Plaintiff/Counter-Defendant | * | |
| v. | * | Case No. 1:10cv1321-LOG-IDD |
| **HARKINS BUILDERS, INC.** | * | |
| Defendant/Counter-Plaintiff. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SECOND AFFIDAVIT OF JASON EVANS

I, Jason Evans, do hereby make affidavit as follows:

1. I am over the age of 18 and competent to testify to the matters herein.

2. I am, and at all times relevant hereto I was, a project manager with Harkins Builders, Inc. I was the project manager for Harkins for the construction project at issue in this litigation.

3. I have reviewed Harkins's Opposition to Plaintiff's Renewed and Second Motion for Partial Summary Judgment (the "Opposition"), and the information and documents referenced therein.

4. Work on the project began in August 2008. During the period from August 2008 through the end of November 2009, Harkins demolished the building that previously occupied the site, excavated for the below grade garage, constructed the concrete foundation walls and floors for the underground garage and pedestal, enclosed the exterior walls, installed a temporary roof and was working on the permanent roof, completed rough-in, framing and drywall for all of the floors, completed and was punching out the finishes for the first, second and third floors, and

was performing finish work on the fourth and fifth floors. A true and correct copy of the contract between Harkins and 2300 for the project (the "Contract") is attached hereto as **Exhibit 1**. The Contract has two main components, the agreement (the "AIA 101") and the general conditions (the "AIA 201").

5. At the end of November 2009, rain leaked into the building during a severe storm, causing damage to some of the drywall and finishes that were already in place. At that point, Harkins suspended work on the finishes until it could determine the causes and effects of the leaks.

6. Harkins ultimately found two sources of leaks – the roof and the windows in apartment units. First, Harkins learned that there had been leaks at the roof due to the fact that wind from the storm had damaged the temporary laps on some of the parapet walls that were still under construction. Harkins's roofing subcontractor performed corrective work to prevent any further water leaks at the parapets and then continued its work to complete them. As to the leaks at the windows, Harkins learned of a manufacturing defect in the corners of the tank below the operable sash. Harkins's window subcontractor undertook to perform corrective work to prevent any further water leaks at those corner joints. Harkins also undertook prophylactic steps to prevent mold from growing in the building, including the removal of the perimeter drywall and vapor barrier.

7. By January 27, 2010, the roof parapets and the corrective work on the corner joints were complete, the building was dry, and there was no longer a significant risk that rain would leak into the building either through the roof or the windows. At that point, Harkins re-commenced drywall and finish work. During this period, Harkins was working around the clock (literally) to make up for lost time. Its efforts were successful, and by February 25, 2010,

Harkins had achieved substantial completion of the work.

8. From February 25, 2010 to July 27, 2010, Harkins took the project from substantial completion to final completion. The work during that period included: (a) performing further corrective work on the windows, (b) performing site work that had been delayed by 2300, and (c) finishing items on the punch lists.

9. After achieving final completion, Harkins requested final payment. When 2300 refused to make final payment, Harkins filed an action to enforce a Mechanics' Lien in the Superior Court for the District of Columbia. Thereafter, 2300 commenced this action. After filing suit, 2300 then submitted a claim to the architect under the disputes clause of the contract.

10. Under Section 3.8.1 of AIA 201 Harkins was required to furnish windows "by such persons as the Owner may direct…." See **Exhibit 1**. Pursuant to this provision, 2300 designated Series 4500 windows manufactured by Wojan Window & Door Corporation ("Wojan").

11. Section 12.2.1.1 of the contract general conditions (the "AIA A201") states, in part, "[t]he Contractor shall promptly correct Work . . . failing to conform to the requirements of the Contract Documents." See **Exhibit 1**. On March 26, 2010, Caffes-Steele, Inc. ("Caffes") requested the opportunity to remediate the windows in lieu of replacing them. At Caffes's request, Harkins asked 2300 if Caffes could correct the defects in the field in lieu of removing and replacing the windows.

12. Section 9.8.1 of the AIA 201 states: "[s]ubstantial completion is the stage in the progress of the Work when the Work . . . is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use."[1] See **Exhibit**

---

[1] 2300's intended use of the building was to the lease units to tenants.

1. By February 25, 2010, the **entire building** was sufficiently complete in accordance with the Contract Documents so that 2300 could occupy and utilize the **entire building** for its intended use.

13. Authorization for 2300 to utilize and occupy the building for its intended use occurred on February 25, 2010 with the issuance of the Certificate of Occupancy. A true and correct copy of the Certificate of Occupancy is attached hereto as **Exhibit 2**. It applied to the **entire building**, *i.e.* all 118 apartment units on the second through fifth floors, all six retail spaces on the first floor, and all 74 parking spaces and 52 bicycle spaces in the underground garage.

14. Upon receipt of the Certificate of Occupancy, 2300 immediately began occupying and utilizing the building for its intended use. On February 26, 2010, 2300 requested keys for 16 apartments and began to move tenants into those units the next day. A true and correct copy of a February 26, 2010 email from Eduardo Castro, a Harkins superintendent on the project, to Jason Evans, Harkins's project manager, is attached to hereto as **Exhibit 3**. 2300 assumed responsibility for the utilities for the **entire building** as of March 5, 2010. By March 12, 2010, the keys for every unit in the **entire building** had been turned over to 2300. True and accurate copies of the transmittals for turnover of the keys for all units in the building are attached hereto as **Exhibit 4.**

15. By March 19, 2010, the **entire building** had been inspected and the punch lists had been generated. A true and correct copy of 2300's representative's punchlist matrix setting forth the inspections and punchlist status for the 118 residential units in the building is attached hereto as **Exhibit 5**; a true and correct copy of Harkins's exterior punchlist as of March 18, 2010 is attached hereto as **Exhibit 6**; a true and correct copy of the Architect's punchlist dated

February 25, 2010 for the lobby and residential corridor at the First Floor is attached hereto as **Exhibit 7**; a true and correct copy of the Architect's punchlist for the exterior of the building dated March 19, 2010 is attached hereto as **Exhibit 8;** a true and correct copy of the Architect's punchlist for the stairs, garage and retail units in the building dated March 22, 2010 is attached hereto as **Exhibit 9**.

16. The additional corrective work that was performed on the windows after February 25, 2010 did not preclude 2300 from utilizing and occupying the building for its intended use. In fact, 66 of the units were occupied by tenants during the period when window corrective work took place. A true and correct copy of a spreadsheet used by Harkins to track the corrective work on the windows is attached hereto as **Exhibit 10**. Nothing about the corrective work performed in that period denied 2300 use or occupancy of the building; although it was necessary for Harkins to coordinate the work with the tenants that occupied units, the tenants were not required to vacate during the process, and the workers were in each unit for less than two hours.

17. Pursuant to the contract, Harkins was to be paid an additional $150,000 if it achieved substantial completion by March 25, 2010. A true and correct copy of Change Order 9 setting forth the early completion bonus contract provision as revised by the change order, is attached hereto as **Exhibit 11**. Because Harkins achieved substantial completion by that date, 2300 paid Harkins the $150,000 bonus. A true and accurate copy of Pending Change Order 91 in which Harkins requested the $150,000 early completion bonus is attached hereto as **Exhibit 12**; a true and accurate copy of Change Order 91 in which 2300 agreed to pay Harkins the $150,000 early completion bonus is attached hereto as **Exhibit 13;** a true and accurate copy of Application for Payment 18Rev2 in which Harkins sought payment in the amount of $2,724,190.81,

5

including the $150,000 substantial completion bonus, is attached hereto as **Exhibit 14** (see, pp. 1 and 10); and a true and accurate copy of the wire transfer in which 2300 paid the entire $2,724,190.81 sought in Application for Payment 18Rev2 is attached hereto as **Exhibit 15.**

18. Section 5.2 and 9.10 of the AIA 201 are the contract provisions regarding final completion and final payment. See **Exhibit 1**.

19. Section 5.2.1 provides:

> §5.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:
>
> .1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and
>
> .2 a final Certificate for Payment has been issued by the Architect.

20. Section 12.2.2 of the AIA A201 document referenced therein, provides:

> §12.2.2 ... if, within one year after the date of Substantial Completion of the Work ..., any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so ....

21. Section 9.10 of the AIA A201 provides:

> §9.10.1 Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment . . . .
>
> §9.10.2 Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a

>certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. . . .
>
>§9.10.3 If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor . . . the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted . . .

**Exhibit 1.**

22. Harkins has performed the necessary work and provided the necessary documents to obtain final payment.

23. On August 17, 2010, Harkins submitted its application for final payment. A true and correct copy of Harkins Final Application for Payment, Applications for Payment No. 20A-Final and 20B-Final, is attached hereto as **Exhibit 16**. In its Final Payment Application, Harkins requested payment of the last $1,510,000 that 2300 had been holding. 2300 paid Harkins only $1,000,000. 2300 asserted that there were still six (6) items on the final punch list that Harkins needed to perform before it would release the final $510,000. Harkins was not contractually required to provide five (5) of those items, and the sixth requires direction from 2300 and/or the Architect which has not been provided.[2]

---

[2] The sixth item involved a condenser unit that is in place and operating. It may need to be relocated because of its proximity to a parapet wall. If it is not relocated, the issue could be addressed by installing a rail on the portion of the parapet that is adjacent to the unit. The cost of

24. Additionally, Harkins had also submitted to 2300 and to the Architect each of the applicable items required by §9.10.2. A true and correct copy of the August 10, 2010 email from Harkins forwarding the items required by §9.10.2 is attached hereto as **Exhibit 17**.

25. On September 21, 2010, Harkins requested final inspection of the building. A true and correct copy of the September 21, 2010 email from Harkins is attached hereto as **Exhibit 18**. On September 27, 2010, the Architect conducted the final inspection.

26. Part of the contract work included the installation of marquees at various locations around the building. The marquees could not be installed by April 25, 2010 due to various changes and upgrades made by 2300. As a result of this delay – caused by 2300 – the marquees could not be erected until August 2010 and they were not completed until September 28, 2010.

27. Part of the contract work included the construction of sidewalks around the building and associated perimeter sitework. The sidewalks could not be built and the associated perimeter sitework could not be performed by April 25, 2010 because of unresolved design issues for which 2300 was responsible. As a result of those delays caused by 2300, the sidewalks and associated sitework were not completed until June 22, 2010.

28. Harkins provided a report from ECS Mid-Atlantic, LLC regarding the below grade waterproofing issues, and it is not contractually obligated to submit anything further.

29. Harkins has submitted the following warranties: roofing, below grade waterproofing, hydrotech system, green roof waterproofing, sealants and trash compactor complained of by 2300. The data contained in those warranties is primarily a function of the manufacturer, not Harkins.

---

either resolution is minimal. In its Rule 26(a)(1) disclosures, 2300 estimates the cost to relocate the condenser at $3,500. Harkins acknowledged that it is obligated to perform the corrective work, but was awaiting direction from the architect as to which option should be employed.

8

30. The condenser unit located on the roof that is at issue was placed in its present location due to the congestion caused by the many pieces of mechanical equipment in that area; given its proximity to a parapet wall on the roof, the condenser either needs to be relocated or a railing needs to be installed on the parapet wall adjacent to that unit. Harkins has acknowledged its obligation to address the condition, but is awaiting direction from the Architect as to how the matter should be resolved. Under the contract, 2300 can withhold $3,500 until that matter is resolved, but it cannot withhold any more than that.

30. Harkins is not contractually obligated to provide information from the roofing manufacturer demonstrating the range of acceptable water accumulation on the roof.

31. Harkins is not contractually obligated to provide information from the roofing manufacturer regarding sand accumulation and erosion.

32. During the time that I was on the Project, I did not observe, and to the best of my knowledge no one else at Harkins observed, any conditions that led it to believe that there was improper ponding on the roof.

33. During the time that it was on the Project, I did not observe, and to the best of my knowledge no one else at Harkins observed, any conditions that led it to believe that there was improper erosion or degradation of the sand layer on the roof.

34. It was my understanding that when Change Order No. 91 was signed by the parties, 2300 was recognizing that the project was substantially complete prior to March 25, 2010 and to authorize payment of the additional compensation earned by Harkins as a result.

35. On March 4, 2010, Harkins filed suit against Caffes-Steele, Inc. regarding the damages associated with the water damage and corrective work that occurred prior to that date. On October 7, 2010, Harkins filed an Amended Complaint which named Caffes-Steele, Inc.'s

insurers as additional defendants. Harkins did not allege in either complaint that the problems associated with the windows in any way prevented substantial completion of the work.

36. Jason Iannotti, 2300's designated representative under the Contract, certified Harkins's payment applications during the course of the project. Specifically, Mr. Iannotti certified for payment both of Harkins's Final Applications, 20A and 20B. See a true and correct copy of certified Application 20A-Final and 20B-Final attached hereto as **Exhibit 19.**

      I SOLEMNLY DECLARE AND AFFIRM UNDER PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: 5/24/11

Jason Evans  
Project Manager for Harkins Builders, Inc.