IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| 2300 PENNSYLVANIA AVENUE, LLC, | ) | |
| | ) | |
| Plaintiff/Counter Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:10-cv-1321-LOG-IDD |
| | ) | |
| HARKINS BUILDERS, INC. | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |

## MEMORANDUM OPINION

### I.    Background

This is largely an action for breach of contract, arising out of a mixed-use residential and commercial construction project located in Washington, D.C. The parties to the contract are Plaintiff/Counter Defendant 2300 Pennsylvania Avenue, LLC ("2300") and Defendant/Counter Claimant Harkins Builders, Inc. ("Harkins"). This matter came before the Court for bench trial on June 6, 2011, through June 21, 2011.

### II.    Procedural Posture

2300 initiated this action by filing a complaint on November 19, 2010. Harkins filed its Answer and Counterclaim on December 21, 2010. Upon the Parties' cross motions for summary judgment, the Court found that Harkins failed to achieve substantial completion as required by the Contract prior to August 2, 2010. (Dkt. No. 148). Accordingly, the Court awarded liquidated damages to 2300 but denied the parties motions for summary judgment as to 2300's entitlement to replacement cost or other actual damage to the windows. The Court also denied summary judgment as to the claim for damages regarding the roof and garage waterproofing. These issues,

along with Defendants counterclaim, proceeded to trial and were heard by this Court in June 2011.

### III.   Findings of Fact[1]

Plaintiff 2300, a limited liability company with its principal place of business in Virginia, is the owner and developer of certain real property located at 2323 Pennsylvania Ave., S.E., Washington, D.C. 20020. Defendant Harkins, a Maryland corporation with its principal place of business in Maryland, is a general contractor in the building construction industry. On or about August 6, 2008, 2300, as the project owner ("Owner"), and Defendant Harkins, as the general contractor, entered into a written agreement (the "Contract"), under which Harkins agreed to perform certain work (the "Work") for the construction of a mixed-use apartment and retail building project known as 2300 Pennsylvania Avenue, and located at 2323 Pennsylvania Avenue, S.E., Washington, D.C. (the "Project").

Most significantly, the Work included the construction of underground parking, 7,500 square feet of retail space, and four additional stories containing a total of 118 apartment units. The Project's 118 apartment units constitute affordable housing, and the Project qualified for related tax credits and funding from the District of Columbia.[2] On or about February of 2011, the parties began to encounter disagreements about the completeness and quality of the Work on the Project. This disagreement became the subject of the instant litigation.

---

[1] The Court finds each of the facts in the following paragraphs to have been proven by a preponderance of the evidence.

[2] It was uncontested that 2300 agreed to maintain the management responsibilities of the property for a 20 year period in return for favorable financing from the District of Columbia and the bank.

### a. The Contract

The Contract constitutes a binding and enforceable agreement between Harkins and Owner. The Contract, as referred to in this Opinion, is comprised of a number of documents, including, but not limited to, the Agreement between Owner and Contractor, the General Conditions of the Contract for Construction, the Plans and Specifications, and a number of specifically enumerated exhibits. The Contract also includes properly executed Modifications.

Harkins understood that it was obligated to perform all Contract Work in compliance with the requirements set forth under the Contract. Among other things, the Contract required Harkins to observe all D.C. codes and regulations. Relevant to the present case, D.C. Housing and Building Code Regulation, Title 14, Chapter 7, 14-705, and specifically Section 705.6 of the contract provide that all windows are required to exclude rain completely from entering the structure. In addition, Section 705.2 requires that each window sash be in good condition.

The Contract also provided a submittal process, through which Caffes-Steele, Inc. ("Caffes-Steele") as a subcontractor to Defendant Harkins, submitted a proposed window for the project. The Owner's architect ultimately accepted this window, the Wojan 4500 series, for the project. This window satisfies HC-70 requirements, indicating that it is a high-quality and extremely durable window, as was demanded by the Owner's specifications. A leaking window would not meet these requirements.

The Contract requirements for the garage waterproofing required Harkins to install below grade waterproofing on the Project.[3] Prospect Waterproofing Company ("Prospect") performed the work as a subcontractor. Additionally, Harkins had an express obligation to provide a five-

---

[3] The plans did not call for the floor of the garage to be waterproofed and floor waterproofing was not included in the system. None of the evidence presented has convinced the Court that failure to waterproof the floor slab was a design defect.

3

year Special Warranty for the waterproofing. The warranty was to cover the repair of any leaks that developed during the five-year warranty period.

Under the Contract, the roof to be installed was required to prevent water migration from entering the building through the roof membrane and related flashings. The roof was to be installed in a good, workmanlike manner. Upon completion of the roof, the Contract required Harkins to perform a Flood Test. If any leaks were found, Harkins was obligated to repair them and repeat the Flood Test until no leakage was observed. The Contract also required Harkins to submit a Special Warranty for the full replacement value of completed installation, warranting against water infiltration, defects of materials, and workmanship for a period of 20 years. Harkins entered into a subcontract with David M. Stier Roofing, Inc. ("Stier") to complete the roof on the project.

The Contract also contained a provision for liquidated damages, should the Work under the Contract not be substantially completed by a specified time. [4]

### b. Water Leaks

In, or around, December of 2009, Harkins discovered that water had entered the building. As a result of this discovery, Harkins began an investigation to uncover the cause of the water infiltration.

### i. The Windows

In a letter to Harkins, dated December 9, 2009, Wojan, the window manufacturer, identified there to be a defect in the windows installed at the Project. This defect was identified as at least one cause of the water infiltration problem. In response, Wojan developed a remediation plan to begin repairing the water damaged areas. Caffes-Steele implemented the

---

[4] Pursuant to this provision of the Contract, the Court awarded liquidated damages in its prior summary judgment Order.

plan between December 11 and 12, 2009. Defendant completed the first round of remediation without the Owner or architect's knowledge. In fact, Tim Chapman, the principal of 2300's managing member, did not become aware of the water infiltration and damage until mid-January 2010. The first round of remediation was ultimately found to have been unsuccessful, and as a result, Harkins hired an industrial hygienist to advise on the proper remediation for the water-damaged walls.

A second round of remediation began in January 2010. Like the first efforts, the second round of remediation was unsuccessful in repairing the window leakage issue. The failure of the second remediation strategy was shown through laboratory testing conducted sometime in February 2010 when the National Certified Testing Laboratories ("NCTL") performed a water penetration test in accordance with ASTM E331.[5]

At a meeting to determine the next steps to achieve window leakage repair, the Owner and Harkins agreed to attempt further remediation. A third round of remediation was developed in March 2010 and undertaken in April 2010. The third remediation attempt also failed the water penetration test conducted by NCTL.

The parties developed and implemented a fourth, fifth, and sixth remediation plan. These plans included the replacement of operable window sashes for 10 of the window units. Wojan manufactured the new sashes, which were subsequently installed in the building. Following installation, the sashes were tested for water penetration using the American Architectural Manufacturer's Association ("AAMA") 502 test. Three of the openings passed the test, and two failed the initial test. Each passed after a subsequent field remediation. Following the successful

---

[5] The ASTM E331 is the "Standard Test Method for Water Penetration of Exterior Windows, Skylights, Doors, and Curtain Walls by Uniform Static Air Pressure Difference." *See* Def's. Ex. 64; *see also* Trial Tr. vol. 4, 1014:11-14, June 9, 2011.

final field remediation, 400 sashes were manufactured to replace the remaining windows in the building. The sashes were installed in July 2010.

After the final remediation steps were undertaken, and the sashes were replaced, five window openings were tested using the AAMA 502 test; each passed.

### ii. The Waterproofing

In or around December 2009, Harkins observed approximately twenty leak locations and water infiltration in the foundation walls of the garage. The leaks were systemic and manifested themselves in a uniform pattern. Water infiltration was also noted in the foundation walls at pipe penetrations in the sprinkler room. Prospect determined that these leaks were not covered under the warranty;[6] however, there was no dispute as to the existence of the leaks or that Harkins would assume responsibility for ensuring that the leaks were remediated. Consequently, Harkins paid Prospect separately to repair the leaks, and Prospect returned to the Project in February 2010 to make repairs to the leaks in the foundation walls and at the pipe penetrations. These repairs were ineffective.

As reported by the architect, leaks were discovered in the foundation walls in August, September, and December 2010. In the architect's letter, she states her determination that the waterproofing in the garage was damaged or not properly installed.

The Owner observed leaks in March and April 2011, and Prospect again returned to the site to chemically inject the leaks. To date, the garage leaks have not been remediated. *See* Iannotti Test., Trial Tr. vol. 5, 1276, June 13, 2011. Moreover, the continuous injection of grout into cracks in the foundation wall and the presence of hydrostatic pressure may cause the water

---

[6] The leaks at the pipe penetrations were likely the result of the fact that the penetrations were drilled after the waterproofing was installed. This caused a breach in the integrity of the waterproofing. As to the foundation wall leaks, Prospect stated that the only way to determine whether the leak fell under the warranty would be to investigate after excavating and removing the backfill. Instead, Harkins had opted to simply make negative-side repairs, meaning repairs from inside of the building.

infiltrating the foundation to manifest itself in the form of additional leaks in the foundation wall
which will require further repair.

Mr. Joseph Shuffleton, an expert in the field of waterproofing, indicated that the water
infiltration into the concrete foundation in the garage indicates that the below grade
waterproofing, as installed by Harkins, has failed.[7] As a result of the ongoing leaks, the Owner
will incur additional costs and will face extensive liability to address the leaks and make ongoing
future repairs.

### iii.  The Roof

2300 alleges that it is entitled to $390,000 in damages, representing the cost to replace the
roof. 2300 claims that it is entitled to these damages because Harkins defectively installed the
roof, a flood test was never performed, and that there is no valid Special Warranty in place or
available. Specifically, 2300 alleges that the roof exhibits ponding in violation of National
Roofing Contractor Association standards and that the granules necessary for ultraviolet
protection are scuffed and rinsing off the roof. 2300 claims that Harkins was not merely required
to provide a roof that did not leak; the Contract also required that the roof be installed in good,
workmanlike manner.

In response, Mr. David Stier, the president of the roofing subcontractor company used for
the Project, and Mr. Russell Levi, offered as an expert in roofing installation and analysis,[8]
testified that there were no issues with the roof that would warrant its removal or replacement.
Mr. Levi claimed that, in his opinion, "the installation, the workmanship, the detailing of the

---

[7] Shuffleton indicated that he was unsure whether the leaks were caused by poor quality waterproofing, improper
installation, or post-installation damage. The Court finds that determining which of these factors caused the leaks in
the waterproofing is unnecessary as Harkins would maintain responsibility for curing any of these causal factors.

[8] Mr. Levi was the only roofing expert to testify at trial. The Court has reviewed the Trial Transcript, *see* Vol. 7,
1821-24, June 20, 2011, and overrules Plaintiff's objection that Mr. Levi is not qualified as an expert.

roofing membrane and sheet metal work ranged from good to excellent." Trial Tr. 1825:23-25.

Mr. Stier and Mr. Levi testified that no condition on the roof exhibited ponding. As to the issue

of granule erosion and ultraviolet protection, the Defendant provided testimony indicating that

the granule displacement was not of an issue of concern as to waterproofing. Mr. Levi testified

that there might be some extra ultraviolet protection over top of a superfluous material, but that

the granules were largely aesthetic. He also testified that virtually every roof installation using

granules will have some initial displacement until the water or wind carries excess granules

away. Finally, Mr. Stier testified that Polyglass is required to stand behind any warranty that they

issue.

## IV.    Conclusions of Law

### a.  Count I: Breach of Contract

2300 claims that Harkins breached the Contract in its failure to provide windows,

waterproofing, and roofing in accordance with the contract terms. 2300 claims that as a result,

damage has, and will continue to occur.

According to the contract, District of Columbia law applies to 2300's Contract claims.

Breach of contract claims in the District of Columbia follow the traditional common law, and the

elements are: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the

contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v.

Mendez*, 984 A.2d 181, 187 (D.C. 2009).

Damages for breach of contract include "the amount necessary to place the non-breaching

party in the same position he or she would have been in had the contract been performed."

*Rowan Heating-Air Conditioning-Sheet Metal, Inc. v. Williams*, 580 A.2d 583, 585 (D.C.1990)

(citing *Thorne v. White*, 103 A.2d 579, 580 (D.C. 1954)). The non-breaching party may recover

the amount that it would cost to complete the unperformed service. *Id.* Damages must be proved with reasonable certainty; however, "[t]he trial court's award will be upheld as long as it is a 'just and reasonable estimate based on relevant data,' even if it is not proven with mathematical precision." *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 329 (D.C. 2001) (quoting *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 (D.C. 1981)); *see also Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C. 1982) ("While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages.").

It is undisputed that 2300 and Harkins, by contract, entered into a valid and enforceable agreement that imposed various duties and obligations upon the parties. An analysis follows of the particular duties, whether those duties were breached, and any resulting damages.

### i. Windows[9]

It is initially 2300's burden to show that Harkins has not complied with its obligations under the Contract. The Contract required the windows to meet HC-70 specifications. 2300 demonstrated that the windows leaked, were defective, and were then heavily remediated in an attempt to repair the defects. This is a sufficient showing to demonstrate that the windows did not comply with the specified requirements and to shift the burden to Harkins. Once the burden has shifted, it became Harkins' obligation to persuade the Court that the repairs did in fact ameliorate the concern and that Harkins provided 2300 with windows sufficient to comply with the contractual HC-70 requirements. Harkins has not met this burden.

Not only has Harkins failed to provide sufficient evidence to the Court that the windows are HC-70 compliant, but Harkins also failed to provide 2300 with sufficient evidence that the

---

[9] As an initial matter, the Court has considered Plaintiff's Motion to Strike the Testimony of David Onks and John Runkle (Dkt. No. 184). The Court DENIES this motion. The issues Plaintiff raises in the motion go to the credibility rather than the admissibility of the evidence, and the Court has weighed the testimony accordingly.

9

remediated windows meet this standard. This failure, in and of itself, is a breach of the Contract. Article 3.5.1 of the Contract's General Conditions states: "If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment." 2300 attached punch lists to the Certificate of Substantial Completion. The Certificate identified items on the punch list as "items to be completed or corrected." Punch List 2 noted that Harkins needed to provide a final report showing that the windows met HC-70 requirements as specified in the Contract documents. No such report was provided.

Nor could such a report have been provided as Harkins never completed the requisite testing that would enable it to produce such a report. The fact that the windows leaked and caused substantial damage to the Project demonstrates that the HC-70 product qualification originally supplied with the windows no longer showed that the windows complied with the contractual requirements. The window remediation attempts only added to the concern that the windows failed to comply with the HC-70 standards. The subsequent testing did not affirm that the windows met the standard. Although each of the five window openings tested after the final remediation passed the AAMA 502 test, the Court finds that after the completion of the field remediation, none of the windows were tested for compliance with the HC-70 performance requirements for issues such as air penetration resistance, structural loading, or forced entry resistance. Compliance with the HC-70 requirements was compromised during the numerous rounds of window remediation when the windows were subject to drilling of holes, injections of foam compound and seam sealer, applications of new sealant, additional caulking, and the installation of a redesigned replacement operable sash. The Court also finds that the windows tested in the final round of post-remediation testing were not selected randomly and do not represent the test requested and required by the Owner as a condition of accepting defective but

corrected work. Moreover, the Court finds the testing documentation to contain significant errors which weighs against the reliability of that evidence.

Accordingly, the Court finds that the preponderance of the evidence weighs in favor of 2300's assertion that the windows fail to comply with the Contract documents, and that 2300 is entitled to damages for the replacement of the windows in the amount of $2,683,962.[10] The Court also awards $250,000 as compensation for the additional architectural and engineering costs, construction management fees, and zoning and legal costs associated with the window replacement, as well as $137,527 to compensate for additional costs suffered as a result of the testing required throughout the course of the Harkins' remediation attempts.

### ii. Waterproofing

The Court finds that Harkins further breached its contractual duties by furnishing a defective waterproofing system in the garage. Under the Contract, Harkins had a duty to correct any defect in the waterproofing system. To date, the system continues to leak in spite of numerous repair attempts.

Harkins maintains that it is not responsible for the leaks that are the consequence of a design defect in the Owner's plans and specifications, when Harkins built the project in compliance with those specifications. *United States v. Spearin*, 248 U.S. 132, 137 (1918). However, 2300 put forth sufficient evidence at trial to demonstrate that the below grade waterproofing, rather than faulty plans, is the defect that ultimately caused the leak. The Court is persuaded that 2300 adequately established a prima facie case with a sufficient quantum of evidence to shift the burden of persuasion to Harkins. *See Nader v. de Toledano*, 408 A.2d 31, 48 (D.C. 1979) (explaining burden shifting during the course of a trial).

---

[10] For all damages estimates, the Court found Mr. Bellingham's testimony as to damages most persuasive. *See* Pl's. Ex. 1146.

To the extent that Harkins' defense to the breach is based on an assertion that there was a design deficiency, that burden of proof is Harkins' to establish, *id.*, and Harkins' evidentiary testimony as to other potential causes for the leaks has not persuaded the Court that it has met that burden. Stated again, the Court finds that the evidence presented at trial proves, by a preponderance, that the leaks were the result of Harkins breaching its duty owed under contract and that Harkins has not met the evidentiary burden required to convince the Court otherwise.

Moreover, the evidence at trial indicates that the garage will continue to leak and require continued maintenance, inspections, and expensive chemical grout injections over the life of the system. These measures would not have been required if the waterproofing system had been furnished in accordance with the contractual obligations. 2300 provided evidence that damages for the next twenty years[11] would total $370,000. Because the Court was not persuaded by a preponderance of the evidence that spalling is likely to occur in the future, the Court will not award the portion of the alleged damages allocated for the future spalling reparations estimate. Accordingly, the Court awards $210,000 in damages for the breach of contract as it relates to waterproofing.[12]

Under the Contract, Harkins owed a duty to 2300. Harkins breached that duty by providing faulty waterproofing. The breach caused leakage in the Project, and that leakage has and will continue to cause damage to the Project. As a result, 2300 is entitled to recover damages in the amount of $210,000.

---

[11] *See supra* note 2.

[12] This figure is based on the damages calculations provided by Mr. Bellingham. *See* Pl's. Ex. 1146.

### iii.  Roof

The Contract imposed upon Harkins the duty to provide a roof of good, workmanlike quality that prevents water infiltration. The Contract also requires Harkins to provide a Special Warranty on the roof. Although the Plaintiff alleges that the roof is noncompliant, the Court is not persuaded by a preponderance of the evidence that the roof failed to meet Contract specifications. No evidence at trial established that the roof leaks. Rather, the Court finds that the testimony highlighted *supra* from Mr. Stier and Mr. Levi provided convincing evidence that the alleged defects in the roof were either not defective or were largely aesthetic. The roof was not the cause of any of the water leaks at issue. Mr. Stier and Mr. Levi's testimony was also persuasive that Harkins installed the roof in a good and workmanlike manner. Moreover, the Court concludes that the evidence demonstrates that Defendant provided the contractually required roof warranty. Harkins did not breach its duty in relation to the roof installation.[13] Accordingly, the Court concludes that Plaintiff has not met its burden to show that Defendant breached any of its contractual obligations with regard to the roof, and Plaintiff is not entitled to damages resulting from alleged roof noncompliance.

The parties did agree, however, that 2300 is entitled to compensation to relocate the roof condenser. Accordingly, the Court awards damages in the amount of $3,500.

### iv.  Miscellaneous Costs

Plaintiff also claims that it is entitled to $27,000 based on the costs necessary to make further modifications to eight stairway doors that are allegedly needed to bring the doors into

---

[13] The Contract required Harkins to perform a Flood Test, whereby Harkins was required to submerge the roof under two inches of water for 24 hours. However, because of the roof's structural design and slope, performing such a test would be unreasonably dangerous and inappropriate. Mr. Levi testified that such a test would cause the roof to collapse and that the test could not be accomplished. Moreover, there is no evidence that the roof leaks, and the Court finds no evidence that the Plaintiff was damaged from a failure to perform this test. Because performing the test would be impossible under these circumstances and because the Plaintiff has not shown any resultant damage, the Plaintiff may not recover damages based on Harkins' failure to comply with this Contract term.

code compliance. Plaintiff's claim is denied. The evidence establishes that Harkins constructed the stairs per all contract documents, and even though Harkins followed the contract requirements, the dimensions do not comply with what 2300 contends the code requires.

Although the architect issued a supplemental sketch that shows a change to the contract regarding the issue, the architect never issued a construction change directive to perform the work and the Owner never issued a change order to perform the work. The contract specifically provides in sections 3.2.2 and 3.2.3 that

> The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations . . . . The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents . . . unless the Contractor recognizes such error . . . and knowingly failed to report it to the Architect.

There is no evidence that Harkins recognized that the stairway doors were noncompliant with ADA regulations or applicable building codes. As a result, Harkins did not perform the work and is not required to perform the work without a proper direction and a change order under the Contract. The duty to bring the doors into compliance with D.C. codes was never transferred from 2300 to Harkins, and 2300 is not entitled to damages.

### b.  Count VI: Fraud

The evidence at trial suggests that from December 1, 2009, until January 7, 2010, Harkins did not advise 2300 that water leaked into the building through the windows or that the water infiltration had damaged the drywall and caused suspected mold growth. In early January 2010, some of Harkins' project personnel decided not to discuss the window issue with the Owner at the upcoming progress meeting, scheduled for January 7, 2010. During a walk through following this meeting, Harkins' personnel, in response to an inquiry about drywall that had been removed, advised 2300's construction manager that water had leaked into the building through

uncompleted portions of roof parapets; however, Harkins' personnel failed to disclose that some water had also entered the building due to window defects. On January 15, 2010, Harkins' project personnel finally informed 2300 about both the roof and window leaks in response to a request to identify all sources of the water infiltration.

"A prima facie case of fraud requires a showing of (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken by appellant in reliance upon the representation, (6) which consequently resulted in provable damages." *Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 840 (D.C. 1983).

Plaintiff carries the burden of persuading the court that the elements of fraud exist by clear and convincing evidence. *Mills v. Cosmopolitan Ins. Agency, Inc.*, 424 A.2d 43, 49 n.3 (D.C. 1980). Upon reviewing the facts and circumstances in the present case, the Court is not persuaded that fraudulent intent exists.

Plaintiff has not shown sufficient evidence to prove that Harkins intended to deceive 2300 as to the water leaks and water damage. Instead, Harkins continuously displayed the intent to remediate and replace all defective aspects of the Project. Indeed, the Contract requires Harkins to repair or replace damaged work. Although Harkins' decision to initially conceal the water leaks and resulting problems from 2300 was arguably not the most laudable choice, the decision was made so that Harkins could contemplate possible solutions to the problems. No evidence suggests that Harkins intended to indefinitely conceal the water damage issue.

### c. Count IV: Negligence

The Court also denies any damages in relation to Plaintiff's negligence claim. Plaintiff cites *Towers Tenant Ass'n, Inc. v. Towers Ltd. Partnership*, 563 F. Supp. 566 (D.D.C. 1983), in

support of its position that Harkins owed an independent duty to 2300, aside from the duty imposed via contract, to perform its work in a skillful and diligent manner. The facts in *Towers Tenant Ass'n* are distinguishable from the present case because there, the extracontractual duty arose as a result of the landlord-tenant relationship between the plaintiff and the defendant. No such duty exists in this case. Each of the duties owed here result solely from the contractual relationship between the parties. Plaintiff's negligence claim is barred because there is no independent duty arising in tort.

### d. Counterclaim & Count V: Declaratory Judgment

The Court also finds that 2300 is entitled to the contract balance that it has properly withheld for defective and delayed work. Harkins is not entitled to the remaining payment because it failed to fulfill all its obligations which were conditions precedent to final payment under the contract. Instead, Harkins filed a mechanics lien. Accordingly, Harkins is not entitled to any further payment and Harkins' counterclaim is denied.

### e. Damages and Fees Summary

#### i. Contract Damages

In sum, 2300 is entitled to $3,922,189 in contract damages, based on the forgoing analysis.[14] This sum is based on the following breakdown:

| | | |
|---|---|---|
| 1. | Liquidated Damages | $637,200 |
| 2. | Testing Related Costs | $137,527 |
| 3. | Window Replacement Costs – Subtotal | $2,683,962 |
| | a. *General Contractor and Subcontractor Costs, General Conditions & GC Fee* | *$2,553,704* |

---

[14] The damages awarded for the breach of contract claim (Count I) encompass any entitlement to damages under a theory for breach of implied duty of good faith and fair dealing (Count II) or breach of express and implied warranties (Count III). Accordingly, the Court does not separately address these claims.

|   | | |   |
|---|---|---|---|
| | b. | *Permits and Processing* | *$30,435* |
| | c. | *Builder's Risk Insurance* | *$25,000* |
| | d. | *General Liability Insurance* | *$22,162* |
| | e. | *Subcontractor Bond Cost* | *$21,921* |
| | f. | *General Contractor Bond Cost* | *$30,740* |
| 4. | Additional Architectural/Engineering Costs | | $75,000 |
| 5. | Additional Construction Management Fee | | $75,000 |
| 6. | Additional Zoning and Legal Costs | | $100,000 |
| 7. | Repair/Replacement of Roof | | $0 |
| 8. | Repair/Maintenance Costs for Garage Waterproofing | | $210,000 |
| 9. | Cost to Relocate Roof Condenser | | $3,500 |
| 10. | Cost to Repair Stairway Door Issue | | $0 |

### ii.  Liquidated Damages

As the Court determined on summary judgment, Harkins failed to achieve Substantial Completion of the Work prior to April 25, 2010, and therefore is liable to 2300 for liquidated damages in the amount of $637,200. The Court does not find any of Harkins' arguments provide a compelling reason to revisit the Court's prior ruling.[15]

### iii.  Punitive Damages

Plaintiff requests punitive damages. "Punitive damages properly may be awarded where the act of the defendant is accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to

---

[15] In response to 2300's Motion in Limine to Preclude the Testimony of William M. Kime and Any Corresponding Exhibits (Dkt. No. 138), Defendant offered an affidavit at trial (Def's. Ex. 1493). The Court has considered and discounted the affidavit as it is not relevant. The Contract specifies that liquidated damages are to be assessed based on the date of Substantial Completion, not upon any event of occupancy.

aggravate the injury." *Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 992 (D.C. 1980) (quotations omitted). Because the Court has not been persuaded that the Defendant acted in such a manner here, punitive damages are denied.

### iv.  Attorneys' Fees

Plaintiff also requests attorneys' fees. The District of Columbia generally recognizes the "American Rule" that a prevailing party, in most instances, is not entitled to recover attorneys' fees absent a statute or contract provision creating such a right. Although Plaintiff notes that an exception to this rule exists when a party has acted in bad faith, *see Trilon Plaza Co. v. Allstate Leasing Corp.*, 399 A.2d 34, 37 (D.C. 1979), this exception is not applicable in the case at bar. As a result, Plaintiff is not entitled to collect attorneys' fees from the Defendant.

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of the Plaintiff in the amount of $3,922,189.

An appropriate ORDER will issue.

March 2, 2011
Alexandria, Virginia

_____ /s/
Liam O'Grady
United States District Judge